UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**FILED**

AUG 1 5 2011

*****************************************************************************

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR. 11-30042-RAL |
| | * | |
| Plaintiff, | * | |
| | * | **REPORT AND RECOMMENDATION** |
| -vs- | * | **FOR DISPOSITION OF MOTION TO** |
| | * | **SUPPRESS STATEMENTS AND EVIDENCE** |
| AUSTIN P. ABERNATHY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

*****************************************************************************

## Summary

A hit and run driver killed Cole St. John in Ft. Thompson, South Dakota on the Crow Creek Indian Reservation last December.  Federal and tribal officers suspected Austin Abernathy was the driver of the vehicle and talked to him about the incident the night it happened and the next day.  During these conversations, Austin made statements and provided officers with evidence he now seeks to suppress. Because some of the statements and evidence are excludable – and may not be used in the Government's case-in-chief at trial – the Court recommends that Austin's suppression motion be granted in part and denied in part.

## Background

On December 5, 2010, at about 9:15 p.m., the Crow Creek Tribal Police Department received a report that St. John had been struck by a hit and run vehicle. St. John later died from the injuries he sustained.

Witnesses at the scene described the vehicle involved as a loud, dark colored SUV. One of the witnesses believed that the vehicle belonged to the Abernathy family.

Armed with this information, Molanna Clifford, a BIA officer with the Crow Creek Agency, traveled to Terry and Serena Abernathy's residence in an attempt to locate the vehicle. There, Terry confirmed that he owned a Ford Explorer that fit the description given, but that his son, Austin, had the vehicle. Terry tried to reach Austin, but was unsuccessful. Clifford asked Terry to have Austin call police and then left.

Roughly two hours later – and the same night as the accident – Serena entered the police department and said that she and Terry had Austin outside in their vehicle and expressed a concern that Austin might run from the police. BIA Officer Nelson Heart approached the Abernathy vehicle and observed Austin seated in the back seat and Terry standing by an open rear passenger door. Heart overheard Austin tell Terry that the victim – St. John – was lying down when Austin struck him.

Heart then asked Terry if he, Serena and Austin wanted to wait outside in the parking lot or go inside the police department. Terry said that it was better to go inside. Austin, accompanied by Terry and Serena, then walked into the front lobby area, followed by Heart.

BIA Lieutenant Marvin Grass Rope arrived within five minutes. He saw the Abernathys standing in the lobby and noted that Austin appeared stressed – he was pacing the floor and running his fingers through his hair. Grass Rope approached the Abernathys and talked to them. Terry informed Grass Rope that he and Serena had brought Austin to the police department to be questioned about the hit and run. Based on what he saw and heard, Grass Rope believed that Austin was possibly the driver of the vehicle in question. Austin asked Grass Rope how the injured man – St. John – was doing and Grass Rope told Austin that the man was still at the hospital being treated – something that was not true.

At some point during his conversation with the Abernathys, Grass Rope asked Austin if he had been drinking and if he had used any illegal drugs and Austin replied, "No" to both questions. Grass Rope next asked Austin if he had been driving at the time of the hit and run and Austin said, "Yes." Grass Rope informed Austin that Grass Rope wanted Austin to submit to a portable breath test (PBT) and to provide a blood sample. Although Austin did not respond, he did accompany Grass Rope into the booking room.

While in this room, Heart obtained identifying information from Austin, including his age and date of birth, and asked Austin if he had consumed any alcohol. Austin replied that he had drank two beers and was going home. In response, Heart administered a PBT to Austin, which yielded a reading of .077. Heart then placed Austin under arrest for underage possession/consumption of alcohol and Mirandized him. When asked if he wanted to talk about the incident, Austin shook his head from left to right and said, "No, not right now." To clarify, Heart asked "What's that?" to which Austin said, "I'll wait."

In the meantime, Grass Rope, who had left the booking room, learned that Austin was on tribal probation. At some point, Grass Rope returned to the room and asked Austin if he was still on probation. Austin confirmed that he was and Grass Rope arrested him for contempt/violating his probation.

At the direction of Chief of Police Scott Shields, Heart transported Austin twice that night to Mid-Dakota Hospital in Chamberlain – about a 30-minute drive – for separate blood draws. During the first transport, Austin inquired about his vehicle and certain electronic equipment in it. After arriving, he asked if the victim's family was at the hospital and indicated he wanted to tell family members that he was sorry for what happened.

The following day – December 6 – BIA Criminal Investigator Tino Lopez and FBI Agent Oscar Ramirez interviewed Austin at the Lower Brule correctional facility. The officers met with Austin in a meeting room there for about 50 minutes to an hour. They Mirandized Austin and he waived his rights and agreed to talk to them. Not only did he incriminate himself during the interview – admitting that he was the driver, had left the scene and had been drinking – but he also wrote an apology letter to the St. John family.

On April 12, 2011, Austin was charged, by Indictment, with the felony offense of involuntary manslaughter, in violation of 18 U.S.C. §§1153 and 1112. He subsequently filed a motion, seeking to suppress all statements made and evidence taken from him on December 5-6.

The Court held two evidentiary hearings on the motion. Five witnesses ultimately testified and four exhibits were received into evidence.

### Statements to Grass Rope in the Police Department Lobby

Austin initially claims that the statements he made to Grass Rope in the front lobby area of the police department were obtained in violation of *Miranda*[1] and should be suppressed. In particular, he maintains that he was in custody at the time and should have been advised of his *Miranda* rights before being questioned.

Law enforcement officers are not required to administer *Miranda* warnings to everyone whom they question.[2] Rather, "warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable and to which it is limited."[3]

The "ultimate inquiry" in the custody determination "is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[4] "Two discrete inquiries are essential to this determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he [ ] was not at liberty to terminate the interrogation

---

[1]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2]*Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

[3]*Id.*

[4]*California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*) (internal quotation omitted).

and leave."[5]  The custody inquiry thus turns on how a reasonable person in the suspect's

position – based on the totality of the circumstances present – would have understood his

situation.[6]

Austin – along with his parents, Terry and Serena – came to the police department

and met with Grass Rope in the front lobby area of it.  Open to the public, this area was not

one that was police dominated and Austin was free to move about unhampered and did

so.  He responded to questions asked of him without any objection.  No strong-arm tactics

or strategies were employed to get him to talk or incriminate himself.  Grass Rope's queries

were very brief and he did not immediately arrest Austin at the conclusion of them.

A couple of observations regarding the lobby interview should be made.  First,

*Miranda* warnings are not required "simply because the questioning takes place in the

station house."[7]  Second, some degree of coercion is part and parcel of the interrogation

process and the coercive aspects of a police interview are largely irrelevant to the custody

determination except where a reasonable person would perceive the coercion as restricting

his freedom to depart.[8]

---

[5]*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted).

[6]*Stansbury v.* California, 511 U.S. 318, 324 (1994).

[7]*Mathiason*, 429 U.S. at 495.

[8]*See id.; see also Stansbury*, 511 U.S. at 324-25 (stating that an officer's suspicion concerning a suspect and purpose for conducting an interview bears upon the custody determination "only if the officer's views or beliefs . . . would have affected how a reasonable person in that position would perceive his [ ] freedom to leave.")

Whatever coercion may have existed during the interview was not the sort that a reasonable person, standing in Austin's shoes at the time, would have regarded as circumscribing his ability to leave. Indeed, the facts support the opposite conclusion. Austin was never physically restrained or placed in handcuffs. And, he could have left the lobby area – and the building – with his parents, but chose to stay and cooperate with police.

Austin's colloquy with Grass Rope in the lobby is largely indistinguishable from the situations present in *Mathiason* and *Beheler*. Austin was with his parents in a public area when he spoke to Grass Rope. He was not under arrest at the time and his freedom of movement was not fettered in a manner associated with a formal arrest. He was therefore not in custody – within the meaning of *Miranda* – and entitled to warnings before being questioned.[9]

## Statements to Heart in the Booking Room

Austin next asserts that his statements to Heart, while in the booking room, were elicited in violation of *Miranda* and should be suppressed. He contends that because he was not free to leave, he could not be questioned without first being advised of his *Miranda* rights.

_____

[9]*See United States v. Black Bear*, 422 F.3d 658, 661-663 (8th Cir. 2005); *United States v. Brave Heart*, 397 F.3d 1035, 1038-40 (8th Cir. 2005); *see also United States v. Betone*, 686 F.Supp.2d 949, 952-54 (D.S.D. 2010) (interview at the federal building by FBI agents); *United States v. Running*, 698 F.Supp.2d 1186, 1191-93 (D.S.D. 2009) (defendant interviewed at a county law enforcement center).

It is undisputed that before he was arrested for underage consumption, Austin was asked questions and gave incriminating statements about his age, date of birth and whether he had been drinking and driving that night. The Government argues that Austin's statements were not in response to custodial interrogation and are admissible.

But when pointedly asked, Heart testified that Austin was probably not free to leave before being arrested and while in the booking room.[10] The Court agrees and finds that Austin was in custody – within the meaning of *Miranda* – at the time.

Austin's freedom of movement was  more encumbered in this room and the atmosphere was more police dominated than it was in the front lobby area. He was segregated from his parents and alone with one, and sometimes two, officers. He could not leave the room without someone first "buzzing" the door and letting him out. No one ever told him that answering questions was voluntary or that he could terminate the meeting at any time and walk out of the room. But perhaps the most telling fact is that Austin was arrested on the spot after he answered Heart's questions and was PBT'd.[11]

Austin should have been advised of his *Miranda* rights before being questioned in the booking room. Because he was not given any warnings until after being arrested, his statements must be suppressed from use as substantive evidence at trial.[12]

---

[10]Mot. Hrg. Tr. 144 (July 6, 19, 2011).

[11]*See United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (a suspect's arrest – or lack thereof – is a "very important factor" in determining custody).

[12]*See United States v. Chavira*, 614 F.3d 127, 132-34 & n. 8 (5th Cir. 2010) (defendant was not in custody when she was questioned at the public pedestrian entry; but she was

(continued...)

The Court, however, finds that the statements were not coerced, but rather, voluntarily given. They are therefore admissible as impeachment evidence in the event Austin decides to take the witness stand and testify in his own defense.[13]

### Statements to Heart En Route to and While at the Hospital

At the beginning of the evidentiary hearing, Austin orally moved to supplement his written suppression motion to include statements he made to Heart while traveling to and at the hospital for his first blood draw.[14] The Court granted the oral motion.[15] Although not altogether clear, it appears that Austin alleges that he was subject to custodial interrogation after invoking his *Miranda* right to remain silent earlier that night while in the booking room with Heart. Presumably, what Austin is referring to is when he shook his head from one side to the other and said, "Not right now" and "I'll wait" in response to Heart's inquiry about whether Austin wanted to talk about the hit and run.

---

[12](...continued)
subject to custodial interrogation after being transferred to a non-public secondary processing area so as to require suppression of her non-Mirandized statements to agents).

[13]*See Oregon v. Hass*, 420 U.S. 714, 720-24 (1975); *Harris v. New York*, 401 U.S. 222, 223-26 (1971); *see also United States v. Garreau*, 735 F.Supp.2d 1155, 1167 (D.S.D. 2010) (defendant's suppressed statements – made in response to custodial interrogation – may be admitted for impeachment purposes if he testifies at trial, so long as the statements were voluntary); *United States v. Smith*, No. CR. 07-30097, 2008 WL 650450 at *6 (D.S.D. Feb. 15, 2008) (voluntary statements taken in violation of *Miranda* may not be used in the prosecution's case-in-chief, but are admissible to impeach defendant's conflicting testimony).

[14]Mot. Hrg. Tr. 5-6.

[15]*Id.* at 7.

During the trip to and while at the hospital itself, Austin made statements and asked

questions on his own.  Volunteered statements, of course, are not barred by the Fifth

Amendment or affected by the *Miranda* holding.[16]  Having listened to the recorded

conversations of Heart and Austin, the Court is not firmly convinced that Heart's inquiries

and dialogue with Austin amounted to express questioning or its functional equivalent that

was reasonably likely to elicit an incriminating response from Austin so as to be

"interrogation within the meaning of *Miranda*."[17]

But even if the *Miranda* safeguards were in fact triggered by virtue of these

conversations,  Austin had been Mirandized just before the trip and he did not clearly

invoke his right to remain silent through his head shake and words of postponement.  As

a result, Heart was not precluded from talking about the incident or asking Austin

questions relating to it later on.

In *Davis v. United States*, the Supreme Court held that a suspect must invoke his

*Miranda* right to counsel "unambiguously."[18]  If the suspect makes no statement at all,

---

[16]*Miranda*, 384 U.S. at 478.

[17]*See Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980); *see also United States v. Swift*, 623 F.3d 618, 622 (8th Cir. 2010) (voluntary statements made by a suspect, not in response to interrogation, are not barred by the Fifth Amendment and are admissible with or without the giving of *Miranda* warnings); *United States v. Stoneman*, No. CR. 09-30101-RAL, 2010 WL 1610065 at **6-7 (D.S.D. April 20, 2010) (questions posed by tribal officer were reasonably likely to elicit an incriminating response from the suspect); *United States v. Voice*, 627 F.2d 138, 144-45 (8th Cir. 1980) (no "interrogation" under *Innis* and thus no violation of the suspect's *Miranda* rights).

[18]512 U.S. 452, 459 (1994).

police are not required to end the interrogation or even ask clarifying questions about whether the suspect wants to invoke this right.[19]

Just last year, the High Court in *Berghuist v. Thompkins*[20], concluded that there was "no principled reason to adopt different standards" for determining when a suspect invokes his *Miranda* right to remain silent.[21]   In order to invoke this right, the Court observed, the suspect must do so unambiguously.[22]

Austin did not say that he wanted to remain silent or that he did not want to talk with police.  Had he made either of these simple unequivocal statements, he would have invoked his right to cut off questioning.  Because he did neither, there was no "critical safeguard" for police to "scrupulously honor."[23]

What's more, not only did Austin fail to invoke his right to remain silent, but he also waived it by making uncoerced statements to Heart.[24] Austin received and understood his *Miranda* rights and had an opportunity to invoke them and end all questioning[25] – and any

---

[19]*Id.* at 461-62.

[20]130 S.Ct. 2250 (2010); *see also United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007) ("Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of *Miranda*").

[21]130 S.Ct. at  2260.

[22]*Id.*

[23]*Id.* at 2259-60.

[24]*Id.* at 2262-64.

[25]*Id.*

discussion of his vehicle, the incident itself, St. John or the St. John family. But he chose not to do so and carried on with Heart. For this, he cannot now complain – or for that matter, obtain the suppression relief he asks for.[26]

### Statements to Lopez and Ramirez at the Jail the Following Day

As grounds to suppress the statements he made to Lopez and Ramirez while in custody on December 6, Austin makes two distinct arguments. First, he says that he invoked his *Miranda* right to remain silent the previous night when he told Heart that he did not want to talk about the incident "right now" and wanted to "wait." Second, he asserts that his statements to the officers were involuntary under the Fifth Amendment.

## A. Right to remain silent invocation

The Court has already discussed the right to remain silent argument and found it to be without merit. It will suffice to say that Austin did not clearly and unambiguously invoke this right or otherwise send a message to police that he did not want to talk to them. Because of this, the fact that Lopez and Ramirez did not wait at least 14 days before questioning Austin[27] does not matter.

---

[26]*See id.* at 2264.

[27]*See Maryland v. Shatzer*, 130 S.Ct. 1213, 1223-24 (2010) (declaring that where a suspect invokes his right to counsel and then is reinterviewed later on, the *Edwards* presumption of involuntariness applies for 14 days thereafter – but not longer).

## B. Voluntariness

Statements to law enforcement authorities are voluntary if they are "'the product of an essentially free and unconstrained choice by [their] maker.'"[28] A statement is not involuntary "unless the police extort[ ] it from the [suspect] by means of coercive activity."[29]

There is no proof – worthy of belief – that Lopez and Ramirez coerced Austin into making statements, or that his willingness to meet with and talk to Lopez and Ramirez was the product of anything other than his own decision. He was Mirandized and waived his rights. At no time did the officers ever make any threats or promises to Austin or exert any pressure on him. Nor did they use any force or employ physical punishment to get him to talk. The duration, tone and overall atmosphere of the interview were not hostile or intimidating. Austin cooperated with agents and even wrote an apology letter to the St. John family. While with the officers, Austin was not under the influence of alcohol or drugs and nothing he said or did indicated that he suffered from any form of mental incapacity. Considering all of the facts relevant to the voluntariness inquiry, the Government has proven, by a preponderance of the evidence, that Austin's statements were voluntary.[30]

_____

[28]*Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (*quoting Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

[29]*Jenner v. Smith*, 982 F.2d 329, 333 (8th Cir.) (internal quotation omitted), *cert. denied*, 510 U.S. 822 (1993).

[30]*See United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (*en banc*), *cert. denied*,
(continued...)

## PBT and Blood Test Results

In addition to seeking to suppress the various statements he made to officers, Austin also claims that certain physical evidence – the PBT and blood test results – should be suppressed. He argues that these test results were obtained in violation of the Fourth Amendment and the Exclusionary Rule and cannot be used as evidence against him.

### A. PBT

The Eighth Circuit has held that unless a foundation is laid in accordance with the dictates of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[31] and *United States v. Black Cloud,*[32] the PBT is not reliable as anything more than a screening test to be used for probable cause.[33] In doing so, the appeals court observed that "almost every state that has addressed

---

[30](...continued)
543 U.S. 1145 (2005); *United States v. Astello*, 241 F.3d 965, 966 (8th Cir.), *cert. denied*, 533 U.S. 962 (2001); *see also United States v. Reynolds*, 743 F.Supp.2d 1087, 1091-92 (D.S.D. 2010) (concluding that the requisite coercive or overreaching conduct sufficient to render defendant's statements involuntary was lacking); *Running*, 698 F.Supp.2d at 1193-96 (finding that defendant's statements to federal and tribal agents were voluntary).

[31]509 U.S. 579, 593-95 (1993).

[32]101 F.3d 1258, 1261 (8th Cir. 1996).

[33]*United States v. Iron Cloud*, 171 F.3d 587, 590-91 (8th Cir. 1999); *see also United States v. Van Hazel*, 468 F.Supp.2d 792, 797-98 (E.D.N.C. 2006) (before PBT results may be admitted, the government must meet the admission requirements of scientific evidence and produce evidence of the test's reliability); *United States v. Winkle*, No. 02-40106-01-RDR, 2002 WL 31730935 at *1 (D.Kan. Nov. 15, 2002) (PBT is not reliable as anything more than a screening test to be used for probable cause); *State v. Anderson*, 359 N.W.2d 887, 892 (S.D. 1984) (holding that because the PBT is a field sobriety test for establishing probable cause, the results are not admissible against a defendant).

the issue has refused to admit the results of the [PBT] for purposes other than probable cause."[34]

Given the Eighth Circuit's pronouncements concerning the admissibility of the PBT results, the Court sees no need to pass on whether the test results were obtained in compliance with the Fourth Amendment or are excludable as fruit of a poisonous tree. Instead, the law of this Circuit commands that the Government be ordered not to refer to or make any mention of the PBT or seek to use the results from the test in its case-in-chief at trial.

The Government concedes as much, but submits that the test results are admissible as impeachment evidence if, for example, Austin takes the witness stand and denies being given a PBT or to drinking at all on December 5.[35] Whether this is true or should be allowed – without the Government first being required to lay the necessary foundation and establish that both the test and its results are reliable and satisfy federal evidentiary standards – is up to the District Court to address, if need be, at a later time.[36]

## B. Blood tests

Austin also contends that he never consented to the two blood draws that were taken from him during the early morning hours of December 6. His lack of consent and

---

[34]*Iron Cloud*, 171 F.3d at 590 & n. 5.

[35]Mot. Hrg. Tr. 39-41.

[36]*See Iron Cloud*, 171 F.3d at 590-93 (admission of PBT – as substantial evidence – to detect defendant's blood alcohol level at the time of the automobile accident was reversible error).

the absence of any kind of warrant, he says, makes the draws constitutionally unreasonable and requires that the test results be suppressed under the Exclusionary Rule.  The blood samples, however, were properly obtained because they were taken incident to a lawful arrest and by means and procedures that respected Fourth Amendment standards of reasonableness.[37]   Austin was placed under arrest for underage consumption and for violating his tribal probation.  There was no need for police to obtain a search warrant for his blood after these arrests.

The fact that Austin's statements in the booking room – which were most likely used as probable cause to arrest him – were obtained in violation of *Miranda* does not taint the samples or test results or otherwise transform them into poisonous fruit.  Indeed, a majority of the Supreme Court has held that the non-testimonial physical fruits, derived from a suspect's non-Mirandized – but voluntary – statements to police, do not violate *Miranda's* prophylactic rule or the Fifth Amendment's privilege against self-incrimination and are admissible at trial.[38]  This being the case, the Exclusionary Rule – articulated in

---

[37]*See Schmerber v. California*, 384 U.S. 757, 766-72 (1966); *see also United States v. Eagle*, 498 F.3d 885, 892 (8th Cir. 2007) ("Police may conduct a warrantless search by requiring an individual to submit to a blood test where they have probable cause to do so and exigent circumstances exist."); *State v. Herrmann*, 2002 SD 119, ¶17, 652 N.W.2d 725, 730 ("a person can be forced to submit to a test of bodily fluids so long as the seizure is (1) incident to a lawful arrest, (2) taken by a reliable and acceptable method, (3) in a medically approved, reasonable manner, and (4) with probable cause to believe the evidence sought exists").

[38]*United States v. Patane*, 542 U.S. 630, 642-44 (2004) (plurality opinion); *id*. at 645 (Kennedy, J. concurring in judgment); *see also United States v. Morse*, 569 F.3d 882, 884-85 (8th Cir. 2009) (voluntary statements obtained in violation of the *Miranda* rule do not

(continued...)

cases such as *Wong Sun*[39] – does not apply to Austin's blood samples and test results by virtue of the *Miranda* violation that earlier occurred in the booking room.

## Conclusion

All of Austin's statements to police, with the exception of those made in the booking room on December 5, may be used against him at trial.  The excepted statements, while inadmissible as substantive evidence, may nevertheless be utilized to impeach Austin's testimony if and when he testifies.

The blood test results are likewise admissible as physical evidence against Austin. But the PBT results are not unless they are offered for impeachment purposes and then only if the District Court determines that the results pass evidentiary muster.

## Recommendation

Accordingly, it is hereby

RECOMMENDED that Austin's suppression motion,[40] including the supplement to it, be granted in part and denied in part.  The motion should be granted insofar as it seeks to suppress, as substantive evidence, Austin's December 5 statements to police in the

---

[38](...continued)
justify the suppression of non-testimonial physical evidence that is the fruit of a custodial interrogation conducted without *Miranda* warnings).

[39]*Wong Sun v. United States*, 371 U.S. 471 (1963).

[40]Docket No. 20.

booking room of the Crow Creek Police Department and the PBT results.  The motion
though should be denied in all other respects.

## Notice

An aggrieved party must file written objections, within 14 days, in order to attack
this Report and Recommendation before the assigned United States District Judge.[41]

Dated this 15th day of August, 2011, at Pierre, South Dakota.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[41]*See* 28 U.S.C. §636(b)(1).