UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

FILED
NOV 08 2011

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 11-30042-RAL |
| Plaintiff, | |
| -vs- | OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION AND GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS |
| AUSTIN P. ABERNATHY, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Government indicted Defendant Austin Abernathy for the involuntary manslaughter of Cole St. John on or about December 5, 2010. (Doc. 1). Abernathy filed a Motion to Suppress Statements and Evidence. (Doc. 20). Magistrate Judge Mark A. Moreno conducted two evidentiary hearings on the motion to suppress and issued a Report and Recommendation for the Disposition of Motion to Suppress Statements and Evidence. (Doc. 44). Judge Moreno recommended granting in part and denying in part Abernathy's motion to suppress. (Id.). Abernathy timely filed objections to adoption of the Report and Recommendation. The Government has not objected to the Report and Recommendation. Having conducted a de novo review consistent with 28 U.S.C. § 636(b)(1) of the transcript, motion papers, and authorities, this Court adopts the Report and Recommendation for the reasons explained.

I. Facts Pertinent to Motion to Suppress

On the evening of December 5, 2010, Cole St. John was struck by a vehicle and sustained

injuries resulting in his death. The vehicle did not remain at the scene. A witness at the scene described the vehicle involved as being a dark-colored sports utility vehicle. (T. 10-11). Another witness told a law enforcement officer that the vehicle involved belonged to the Abernathy family. (T. 11).

An investigating officer—Molanna Clifford, who is an officer of the Bureau of Indian Affairs (BIA) assigned to the Crow Creek Agency—went to the Abernathy residence to look for the vehicle. (Id.). Abernathy's father acknowledged owning a dark-colored Ford Explorer, but said that his son Defendant Austin Abernathy had the vehicle. (T. 11-12). Abernathy's father then unsuccessfully tried to call his son. (T. 12). Officer Clifford asked Abernathy's father to have his son call the police and then left. (T. 13).

About two hours later that same night, Abernathy's mother entered the Crow Creek Agency police department at Fort Thompson and advised that Austin Abernathy was outside. (T. 17). Abernathy's mother expressed the concern that Abernathy might run from the police. (Id.).

BIA Officer Nelson Heart approached the Abernathy vehicle at the time when Abernathy was in the backseat and Abernathy's father was standing near an open rear passenger door. (Id.). Officer Heart overheard Abernathy say to his father that the victim was laying down when Abernathy struck him. (T. 18). Officer Heart told the Abernathys that Lieutenant Marvin Grass Rope was coming and asked Abernathy's father if they wanted to wait outside or go inside. (Id.). Abernathy's father responded "better go inside" and then went into the lobby of the police station with Abernathy and Abernathy's mother. (T. 18-19).

Officer Heart and Abernathy waited in the lobby of the police department for Lieutenant Grass Rope. The doors to the lobby remained unlocked. (T. 19).

Lieutenant Grass Rope already had talked with Officer Clifford and been to the scene. (T. 62-64). Upon arriving at the police department lobby, Lieutenant Grass Rope saw Abernathy pacing the floor and running his fingers through his hair. (T. 64). Abernathy asked Lieutenant Grass Rope in the lobby how the person involved in the accident was doing. (T. 65). Lieutenant Grass Rope, despite knowing that St. John had died, responded that he did not know and that St. John was at the hospital being treated. (T. 65-66). Lieutenant Grass Rope testified that he did not want to make Abernathy's emotional state worse. (T. 66). Lieutenant Grass Rope asked Abernathy if he had been drinking or using illegal drugs. Abernathy denied both drinking and using illegal drugs. (T. 67). Abernathy admitted to being the driver of the vehicle. (Id.). At that point, Lieutenant Grass Rope brought Abernathy into the booking room. (Id.).

In the booking room, Officer Heart, whom Lieutenant Grass Rope had instructed to give Abernathy a portable breath analysis test (PBT), asked Abernathy for his age and date of birth. Abernathy was 19 years of age. (T. 22). Officer Heart detected an odor of alcohol that "wasn't strong" when close to Abernathy. (T. 23-24). Heart asked Abernathy if he had drank anything. (T. 22). Abernathy said that he had drank two beers and was going home. (Id.). The PBT given Abernathy registered .077. (T. 23). Abernathy then was placed under arrest for underage consumption. (T. 23).

After Officer Heart read Abernathy his Miranda rights, Officer Heart asked Abernathy if he wanted to talk about the incident with St. John. Abernathy responded, "No, not right now." (T. 24). Heart asked, "What's that," and Abernathy replied, "I'll wait." (Id.). No further questioning occurred in the booking room, except for Lieutenant Grass Rope later asking, upon learning that Abernathy was on tribal court probation, whether Abernathy was still on probation. Abernathy

confirmed that he was, so Lieutenant Grass Rope arrested Abernathy for contempt in violating his probation.

At the direction of his chief of police, Officer Heart transported Abernathy twice that night to Mid-Dakota Hospital in Chamberlain for separate blood draws. During the first approximately half-hour trip, Abernathy asked Heart about his vehicle and certain electronic equipment therein. Upon arriving at the hospital, Abernathy asked Heart whether the victim's family was at the hospital and said that he wanted to tell family members that he was sorry for what had happened.

The next day, December 6, 2010, BIA Criminal Investigator Tino Lopez and Special Agent Oscar Ramirez of the Federal Bureau of Investigation interviewed Abernathy at the Lower Brule correctional facility for nearly an hour. (T. 99-101). The officers read Abernathy his Miranda rights. (T. 101). Abernathy waived his rights and agreed to talk with the officers. Abernathy admitted that he drove the vehicle, admitted to drinking and leaving the accident scene, and wrote an apology letter to the victim's family during that interview.

Judge Moreno recommended suppression of the PBT results and Abernathy's statements in the booking room prior to being given the Miranda warning. Judge Moreno recommended denying the motion to suppress otherwise. Abernathy filed several objections to the Report and Recommendation.

## II. Discussion of Abernathy's Objections

### A. Abernathy's Statements to Lieutenant Grass Rope in the Police Department Lobby

Abernathy objects to Judge Moreno's finding that Abernathy was not in custody when he was questioned by Lieutenant Grass Rope in the police department lobby. Abernathy objects on the basis that he was not at the station voluntarily because Officer Clifford had asked Abernathy's father to have Abernathy contact the police and because Abernathy's parents brought him to the station and

4

informed officers there that Abernathy might flee. Abernathy further argues that Lieutenant Grass Rope lied in telling Abernathy that the victim was still alive, possibly intending to "elicit an incriminating response." (Doc. 52 at 3). Finally, Abernathy argues that the police department is a police-dominated building that Abernathy was not free to leave, so Abernathy was in custody and should have been advised of his Miranda rights before being asked questions.

The Fifth Amendment to the United States Constitution states that a defendant cannot be "compelled in any criminal case to be a witness against himself." The Supreme Court of the United States held in Miranda v. Arizona, 384 U.S. 436, 478-79 (1966), that a suspect under custodial interrogation must be given notice of his Fifth Amendment right against self-incrimination. "Custodial interrogation" means "questioning initiated by law enforcement officer after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Yarborough v. Alvarado, 541 U.S. 652, 661 (2004) (citing Miranda, 384 U.S. at 444). To determine whether a defendant was in custody, a court must examine the totality of the circumstances as to "whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." United States v. Muhlenbruch, 634 F.3d 987, 995-96 (8th Cir. 2011) (quoting United States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007)). A court's inquiry should consider several factors, including:

> (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or, (6) whether the suspect was placed under arrest at the end of questioning.

Id. However, "Miranda warnings are not required simply because the questioning takes place in the

station house." Oregon v. Mathiason, 429 U.S. 492, 495 (1977).

Here, Abernathy was not in custody within the meaning of Miranda while at the lobby of the police department. The lobby doors were not locked and Abernathy was not confined. Abernathy arrived with his parents to the police station. Although the lobby was a police-dominated atmosphere and Abernathy was later taken for further questioning and ultimately arrested, Lieutenant Grass Rope used no strong-arm tactics during the brief questioning in the lobby. Abernathy responded voluntarily to Lieutenant Grass Rope's few questions in the police lobby.

Abernathy argues that because his parents brought him to the police station and expressed concern that he might flee, he was in custody even in the lobby of the police department. Parental involvement does not make a police questioning custodial. In fact, "[a] frequently recurring example of police domination concerns the removal of a suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements, an established interrogation practice noted by the Miranda court." United States v. Griffin, 922 F.2d 1343, 1352 (8th Cir. 1990). The presence of Abernathy's parents in the lobby of the police station makes it less likely, not more, that the questioning in the lobby was custodial.

The totality of the circumstances support a conclusion that Abernathy was not in custody in the lobby. Therefore, a Miranda warning was not necessary prior to the questioning in the lobby, and any statements Abernathy made in the lobby are admissible at trial.

### B. Abernathy's Statements to Officer Heart in the Booking Room

Judge Moreno recommended suppression of certain statements that Abernathy made in the booking room prior to being given a Miranda warning, but found those statements to have been made

6

voluntarily and thus admissible at trial as impeachment only. Abernathy argues that the statements he made to Officer Heart in the police station booking room were involuntary under the Fifth Amendment, and therefore should not be admissible, even as impeachment evidence at trial.

"A statement made by a defendant in circumstances violating the strictures of Miranda v. Arizona is admissible for impeachment purposes if the statement was made voluntarily." Meis v. Wyoming Dep't of Corr., 9 F.3d 695, 697 (8th Cir. 1993) (citing Mincey v. Arizona, 437 U.S. 385, 397-98 (1978)). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. Boslau, 632 F.3d 422, 428 (8th Cir. 2011) (quoting United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004). When determining whether a statement is voluntary, the Court considers a totality of the circumstances, including:

> both the characteristics of the accused and the details of the interrogation...the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

Houston v. Lockhart, 866 F.2d 264, 266 (8th Cir. 1989) (quoting Hall v. Wolff, 539 F.2d 1146, 1150-51 (8th Cir. 1976)). "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." United States v. Boslau, 632 F.3d 422, 429 (8th Cir. 2011) (citation omitted).

Precedent from the United States Court of Appeals for the Eighth Circuit makes clear that Abernathy's statements in the booking room were voluntary. In Houston, a defendant's incriminating statements were found to be voluntary when police officers had not threatened the defendant or

physically mistreated him. 866 F.2d 264, 267 (8th Cir. 1989). The defendant in Houston was 24, had a ninth or tenth grade education, and had some previous experience with the criminal justice system. Id. In Harper v. Grammer, defendant Harper challenged the voluntariness of statements he gave to the police after he had repeatedly refused to make a statement without the presence of his attorney. 895 F.2d 473, 481 (8th Cir. 1990). While the statements were taken in clear violation of Miranda, the Eighth Circuit found the statements were the "product of a rational intellect and a free will" and were therefore proper to use for impeachment at trial. Id.

Abernathy was not given a Miranda warning before the questioning took place in the booking room. Abernathy argues that he therefore did not give the incriminating statements voluntarily. However, even statements given without proper Miranda warning, while barred by the Fifth Amendment from being used in the governments case-in-chief, may be used for impeachment purposes if given voluntarily. Here, Abernathy made potentially incriminating statements—that he had consumed alcohol before driving that night—while in custody without being given proper Miranda warnings. Abernathy was only 19 and was not properly advised of his constitutional rights. Abernathy, like the defendants in Houston and Harper, was not subject to threats or violence and his statements were given by his free will. The circumstances surrounding the statements establish that Abernathy was not subject to threats, violence, or treatment that could "critically impair his capacity for self-determination" under Boslau, 632 F.3d at 428. Abernathy's statements therefore were voluntarily given and may be used for impeachment at trial.

### C. Questioning After Miranda Warning

When Officer Heart placed Abernathy under arrest for underage consumption of alcohol, Heart read Abernathy his Miranda rights. Officer Heart asked Abernathy whether he wanted to talk

8

about the reported accident, to which Abernathy shook his head and said, "No, not right now. . . I'll wait." (T. 24, 44). Officer Heart ceased questioning at that time. (T. 44). Abernathy argues that he thereby invoked his right to remain silent under the Fifth Amendment and that later statements—including those made while en route to the hospital and those made the next day—should be suppressed because they were taken in violation of his desire to remain silent.

In Miranda, the Supreme Court of the United States ruled that if a defendant "indicates in any manner, at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease." 384 U.S. 436, 473 (1966). The Court clarified this rule in Michigan v. Mosley, stating that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his right to cut off questioning was 'scrupulously honored.'" 423 U.S. 96, 103 (1975). At issue is whether Abernathy invoked his right to remain silent.

A suspect invokes his right to remain silent by making "a clear, consistent expression of a desire to remain silent." United States v. Ferrer-Montoya, 483 F.3d 565, 569 (8th Cir. 2007) (quoting United States v. Thompson, 866 F.2d 268, 272 (8th Cir. 1989)). An indirect, ambiguous, and equivocal statement or assertion of an intent to exercise the right to remain silent is not enough to invoke that right for the purposes of Miranda. Id. (citing United States v. Johnson, 56 F.3d 947, 955 (8th Cir. 1995)). "Being evasive and reluctant to talk is different from invoking one's right to remain silent." Mann v. Thalacker, 246 F.3d 1092, 1100 (8th Cir. 2001).

In Thompson, the Eighth Circuit found that a defendant's statement that he would "'wait a little while before I'm interviewed'" was not an invocation of the right to remain silent, especially because the questioning officer did not use "persistent efforts or trickery to wear down the

9

defendant's resistance and make him change his mind." 866 F.2d 268, 271 (8th Cir. 1989). In <u>Mann</u>, the defendant stated during his interrogation "I'll just keep to myself." 246 F.3d 1092, 1100 (8th Cir. 2001). The Eighth Circuit in <u>Mann</u> found that such a statement was not an invocation of the defendant's <u>Miranda</u> rights, and that the defendant's subsequent statements need not be suppressed. <u>Id.</u>

Abernathy's statements were very similar to those in <u>Thompson</u> and <u>Mann</u>. Abernathy's statements that he did not want to discuss the accident at that time and that he would "wait" were not an invocation of his right to remain silent. Officer Heart honored Abernathy's desire to not discuss the incident at the time, so there were no "persistent efforts or trickery to wear down the defendant's resistance and make him change his mind." <u>See Mann</u>, 246 F.3d at 1100. The statements that Abernathy made subsequent to his arrest were voluntary and not in violation of his Fifth Amendment right to remain silent.

With regard to the later statements on December 5, as Judge Moreno noted in his Report and Recommendation, it is questionable that Officer Heart's interactions with Abernathy in the car and at the hospital amounted to express questioning reasonably likely to elicit an incriminating response so as to be "interrogation withing the meaning of <u>Miranda</u>." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301-02 (1980). A question concerning whether the defendant was suicidal does not seem on its face to be reasonably likely to elicit an incriminating response by the suspect and therefore would not be in violation of his <u>Miranda</u> rights even if they had been invoked. <u>See United States v. Voice</u>, 627 F.2d 138, 144-45 (8th Cir. 1980). Any statements or questions that were volunteered by defendant, not in response to any police questioning, are not affected by <u>Miranda</u>.

With regard to questioning on December 6, Agent Lopez and Agent Ramirez read

Abernathy his Miranda rights before questioning him at the jail, and Abernathy agreed to waive those rights and speak with the officers. (T. 101). Nevertheless, Abernathy contends that the statements made at the jail on December 6 were involuntary because the statements were not the product of a rational intellect and free will. Abernathy has no evidence that officers "overbore [his] will and critically impaired his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 725 (8th Cir. 2004). Abernathy instead asserts that because the interrogation followed the claimed invocation of his Miranda rights the night before, the questioning was necessarily involuntary. Voluntariness is a separate issue from invocation of Miranda rights. Abernathy has no evidence that his statements on December 6 were "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. Boslau, 632 F.3d 422, 428 (8th Cir. 2011) (citation omitted). The Government has proven, by a preponderance of the evidence, that Abernathy's statements at the jail were voluntary.

### D. PBT results

Neither party objects to Judge Moreno's conclusion that the PBT is not a reliable test under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-95 (1993) and is therefore inadmissible during the Government's case-in-chief at trial. See United States v. Black Cloud, 101 F.3d 1258, 1261 (8th Cir. 1996); United States v. Iron Cloud, 171 F.3d 587, 590-91 (8th Cir. 1999).

### E. Blood tests

Abernathy underwent two blood tests at the hospital in Chamberlain resulting in findings of blood-alcohol content of .070 % and .049 %. Abernathy objects to Judge Moreno's recommendation that the results of the blood tests should not be suppressed.

Because the percentage of alcohol in the blood diminishes with time, an effort to secure

evidence of blood-alcohol content by drawing blood from a suspect after his arrest is a reasonable search incident to arrest. Dodd v. Jones, 623 F.3d 563 (8th Cir. 2010) (citations omitted). Police may require an individual to submit to a blood test without a warrant when they have probable cause to do so and exigent circumstances exist. Schmerber v. California, 384 U.S. 757, 766-72 (1966); United States v. Eagle, 498 F.3d 885, 892 (8th Cir. 2007). The passage of one and a half hours between Abernathy's arrest and the blood draws does not undermine the existence of exigent circumstances in this case, because requiring an officer to get a warrant for the evidence would have caused even greater delay and allowed for further dissipation of alcohol in Abernathy's blood. See Eagle, 498 F.3d at 892.

Here, Abernathy was arrested for underage consumption and violating his tribal probation. The blood samples were taken incident to a lawful arrest and in a way reasonable under the Fourth Amendment. See Schmerber, 384 U.S. at 766-72; Eagle, 498 F.3d at 892. Even if Abernathy's statements in the booking room prior to receiving the Miranda warning formed the initial basis for the arrest, those voluntary statements, though subject to suppression, do not trigger application of the exclusionary rule. United States v. Morse, 569 F.3d 882, 884-85 (8th Cir. 2009).

### III. Conclusion and Order

For the reasons explained above, it is hereby

ORDERED that the Report and Recommendation for Disposition of Motion to Suppress Statements and Evidence (Doc. 44) is adopted. It is further

ORDERED that Defendant's Motion to Suppress Statements and Evidence (Doc. 20) is granted in part and denied in part.

Dated November 8, 2011.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE